# UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA, TALLAHASSEE DIVISION

**JAMES AREN DUCKETT**
      Plaintiffs,

v.

**RICHARD COMERFORD,**
Commissioner, Florida Department of Corrections

**RANDALL POLK**, Warden,
Florida State Prison
        Defendants.

_____/

CIVIL ACTION NO. _____

**EMERGENCY INJUNCTIVE RELIEF SOUGHT; EXECUTIONS SCHEDULED FOR JULY 28, 2026, AT 12:00 P.M..**

## <u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF PURSUANT TO 42 U.S.C. § 1983</u>

BRITTNEY N. LACY
Assistant CCRC-South
*lacyb@ccsr.state.fl.us*

COURTNEY M. HAMMER
Assistant CCRC-South
*hammerc@ccsr.state.fl.us*

Capital Collateral Regional
Counsel - South
110 SE 6th Street, Suite 701
Fort Lauderdale, Florida 33301
Tel. (954) 713-1284
*ccrcpleadings@ccsr.state.fl.us*

MARY E. WELLS
Law Office of M.E. Wells LLC
623 Grant Street SE
Atlanta, GA 30312
*mewells27@comcast.net*
Tel. (404) 408-2180

July 23, 2026

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF PURSUANT TO 42 U.S.C. § 1983

Pursuant to 42 U.S.C. § 1983, Plaintiff James Aren Duckett, a prisoner under sentence of death, hereby brings this action seeking injunctive relief and a declaratory judgment against Defendants, Richard Comerford and Randall Polk, each in their official capacity (collectively, the "State Actors"), and hereby states:

### PARTIES

1.     Plaintiff James Aren Duckett is a citizen of the United States and Florida. He is an indigent death-sentenced inmate in the custody of the Florida Department of Corrections ("FDOC") and incarcerated at Florida State Prison ("FSP") in Raiford, Florida, which is in the Northern District of Florida.

2.     Defendant Richard Comerford is the Secretary of the Florida Department of Corrections. Under Florida law, death sentences are "executed under the direction of the Secretary of Corrections or the secretary's designee." §922.105(1), Fla. Stat. (2025). Moreover, it is the responsibility of the FDOC Secretary to periodically review and certify the Execution by Lethal Injection Procedures "to ensure proper implementation of the Department's statutory duties under Chapter 922, Florida Statutes." Comerford has been the FDOC Secretary since July 1, 2026, and is being sued in his official capacity.

3.     Defendant Randall Polk is the Warden of Florida State Prison.  As FSP's warden, Polk is responsible for setting the date to execute an inmate's

2

sentence "within the week designated by the Governor in the [death] warrant," § 922.11(1), Fla. Stat. (2000), as well as "handling support functions necessary to carry out the lethal injection process." Polk is also statutorily responsible for designating the executioner, § 922.10, Fla. Stat. (2025), and either he "or a deputy designated by him . . . must be present at the execution." § 922.11(1), Fla. Stat. Polk is being sued in his official capacity.

## JURISDICTION AND VENUE

4. The Court has jurisdiction over the claims brought in this action under 42 U.S.C. § 1983, 28 U.S.C. § 1331, 23 U.S.C. § 1343, 28 U.S.C. § 2201, and 28 U.S.C. § 2202.

5. Venue is proper in the Northern District of Florida under 28 USC § 1391(b)(2) because the State Actors are all engaged in the actions at issue in this District, and all State Actors are residents of the District.

## STATEMENT OF FACTS

6. Plaintiff James Aren Duckett was convicted of the 1987 sexual battery and murder of Teresa McAbee in the Fifth Judicial Circuit Court, in and for Lake County, Florida. Mr. Duckett was sentenced to death for the first-degree murder count following an advisory jury's 8–4 advisory recommendation. *Duckett v. State*, 568 So. 2d 891 (Fla. 1990).

7. On February 27, 2026, Governor Ron DeSantis signed a death warrant

3

for Plaintiff Duckett, designating the week beginning at 12:00 noon on Tuesday, March 31, 2026, through 12:00 noon on Tuesday, April 7, 2026, for his execution. As FSP's warden, Defendant Polk set the date and time of Mr. Duckett's execution for Tuesday, March 31, 2026, at 6:00 p.m.

8.    On March 26, 2026, the Florida Supreme Court entered an Order granting Mr. Duckett's motion to stay his execution due to DNA testing of biological evidence permitted by the circuit court. *Duckett v. State*, 428 So. 3d 40 (Fla. 2026); *Duckett v. State*, 431 So. 3d 900 (Fla. 2026). This stay remained in effect until the Florida Supreme Court disposed of Mr. Duckett's 3.851 appeal and habeas petition filed under warrant and vacated the stay on July 8, 2026. *Duckett v. State*, SC2026-0449 & SC2026-0450, 2026 WL 1970442, at *1 (Fla. July 8, 2026).

9.    On July 14, 2026, Governor DeSantis issued a letter resetting Mr. Duckett's execution, designating the week beginning at 12:00 noon on Tuesday, July 28, 2026, through 12:00 noon on Tuesday, August 4, 2026, for the sentence to be carried out. Defendant Polk set the date and time of Mr. Duckett's execution for Tuesday, July 28, 2026, at 12:00 noon.

10.    A second execution of Mr. Dominick Occhiocone had previously been scheduled to take place at the same location on the same day, July 28, 2026, at 6:00 p.m.

4

### A.    Florida's Lethal Injection Procedure.

11.    Under section 922.105(1), Fla. Stats (2025), "[a] death sentence shall be executed by lethal injection, unless the person sentenced to death affirmatively elects to be executed by electrocution." Florida's current three-drug protocol for lethal injection consists of a series of etomidate, rocuronium bromide, and potassium acetate injections. Exh. 1, February 18, 2025, Letter from Warden Ricky Dixon to Governor DeSantis with Lethal Injection Protocols attached.

12.    Mr. Duckett has not elected death by electrocution and stands to be executed by lethal injection on July 28, 2026, at 12:00 p.m. His sentence will be executed under the direction of Defendant Comerford as FDOC Secretary or his designee. § 922.105(1), Fla. Stat.

13.    FDOC's Execution by Lethal Injection Procedures (hereinafter Lethal Injection Procedures) were last certified by former Secretary Ricky D. Dixon on February 18, 2025. Exh. 1. Former Secretary Dixon's letter to Governor DeSantis accompanying the protocol certified that:

> The procedure has been reviewed and is compatible with evolving standards of decency that mark the progress of a maturing society, the concepts of the dignity of man, and advances in sciences, research, pharmacology, and technology. The process will not involve unnecessary lingering or the unnecessary or wanton infliction of pain and suffering. The foremost objective of the lethal injection process is a humane and dignified death. Additional guiding principles of the lethal injection process are that it should not be of a long duration, and that

5

while the entire process of execution should be transparent, the concerns and emotions of all those involved must be addressed.

*Id*.

14.    Former Secretary Dixon further certified that "[t]he Department is prepared to administer an execution by lethal injection and has the necessary procedures, equipment, facilities, and personnel in place to do so." *Id*. This means that FDOC "has available the appropriate persons who meet the minimum qualifications under Florida Statutes and in addition have the education, training, or experience, including the necessary licensure or certification, required to perform the responsibilities or duties specified and to anticipate contingencies that might arise during the execution procedure." *Id.*

15.    FDOC's Lethal Injection Procedures advise that "[t]here will be a review of the lethal injection procedure by the Secretary of the Florida Department of Corrections, at a minimum of once every two years, or more frequently as needed." *Id*., p. 14[1]. This "review [is required to] take into consideration the available medical literature, legal jurisprudence, and the protocols and experience from other jurisdictions." *Id*.

16.    To the best of Plaintiffs' knowledge, Defendant Comerford has not yet

---

[1] The referenced page number in cites to Exhibit 1 refers to the corresponding page number of the attached lethal Injection Protocol.

6

undertaken this periodic review of Florida's Lethal Injection Procedures since assuming his role as FDOC Secretary on July 1, 2026.

17. Defendant Comerford has only overseen one execution as FDOC Secretary during his tenure thus far, which was the execution of Dennis Sochor by lethal injection on July 14, 2026.

18. The Lethal Injection Procedures define the roles of the "Execution Team," the "Executioner," the "Institutional Warden" (Defendant Polk), the "Minister of Religion," and the "Team warden." *Id.,* p. 1.

19. The "Execution Team" refers to "correctional staff and other persons who are selected by the team warden designated by the Secretary to assist in the administration of an execution by lethal injection, and who have the training and qualifications, including the necessary licensure or certification, required to perform the responsibilities or duties specified." *Id.*.

20. "Executioner" refers to "an individual selected by the team warden to initiate the flow of lethal chemicals into the inmate." As explained in the procedures, "[t]he executioner's sole function is to inject the chemicals into the IV access port by physically pushing the chemicals from the syringe," and he or she "is only authorized to carry out this specific function under the direction of the team warden." *Id*.

21. The "Institutional Warden" is the warden of FSP, "who shall be

responsible for handling support functions necessary to carry out the lethal injection process." *Id*.

22.     The "Team Warden" refers to "the warden designated by the Secretary" who "has the final and ultimate decision-making authority in every aspect of the lethal injection process." *Id*.

## B.     Mr. Duckett's Severely Compromised Veins.

23.     Mr. Duckett's veins are severely compromised.

24.     On July 20, 2026, a person on behalf of the prison met with Mr. Duckett to analyze his veins in preparation for the planned execution. The person was masked and did not provide any identifying information so Mr. Duckett cannot provide the name of the person.

25.     The person began examining Mr. Duckett's arms in an effort to find a vein. When difficulty arose, a discussion of Mr. Duckett's medical history ensued. Upon learning that Mr. Duckett had received chemotherapy treatments for cancer, the person conducting the examination informed Mr. Duckett that chemotherapy "really messes up the veins."

26.     The Lethal Injection Procedures dictate that "[a]fter reviewing the results of the examination which should include a determination of the best access site and conferring with the team member(s) that performed the examination, the team warden shall conclude what is the more suitable method of venous access

(peripheral or femoral)[.]" *Id.*, p. 5. If "a team member reports any issue that could potentially interfere with the proper administration of the lethal injection process, the team warden will consult with any or all of the members of the execution team and resolve the issue." *Id*. pp. 6-7.

27. The team warden – who has no medical training – is not qualified in the first instance to "conclude what is the more suitable method of venous access." Second, the procedures do not specify how exactly the team warden is to "resolve the issue" without any assistance from a trained medical doctor.

28. Given Mr. Duckett's history with chemotherapy, venal access will likely require multiple painful needle insertions and blind attempts by the IV team to locate the two required suitable veins. *Id.*, p. 9 (10)(h) (execution team members to designate two separate IV lines).

29. Insertion of an intravenous catheter into a scarred and tortuous vein is extremely difficult and presents a substantial risk that the vein will "blow" and lose its structural integrity, causing the etomidate, rocuronium bromide, and potassium acetate injections to leak into the surrounding tissue.

30. The medical term for this leakage is extravasation.

31. The extravasation of etomidate, rocuronium bromide, and potassium acetate due to a blown vein would cause Mr. Duckett to experience intense and painful burning in the surrounding tissue.

32.    The extravasation of etomidate, rocuronium bromide, and potassium acetate due to a blown vein would also lead to incomplete and inconsistent drug delivery to Mr. Duckett, which would result in a prolonged and only partially anesthetized execution wherein Mr. Duckett would experience the excruciating feeling of suffocating to death.

33.    Obtaining and maintaining intravenous access as required in a lethal injection is more invasive and requires far more venous structural integrity than drawing blood.

34.    Although the Lethal Injection Protocol ostensibly permits venous access through sites other than the arm, *see Id*., p. 9 (10(h) ("If venous access cannot be achieved in either or both of the arms, access will be secured at other appropriate sites…), using smaller peripheral veins like those found in the back of the hand increases the risk of the vein collapsing or blowing out under pressure.

35.    If the IV line infiltrates, the lethal chemicals can leak into the surrounding tissue instead of flowing directly to the heart, causing severe pain and delaying the execution.

36.    The Lethal Injection Procedures do not sufficiently mitigate the risk of extravasation and also fail to address how the execution team can adequately respond to extravasation or other foreseeable and unforeseeable medical situations.

37.    The Lethal Injection Procedures require only that the "executioner shall

10

be an adult" and "undergo a criminal background check[.]" *Id.,* p. 2. They fail to define the phrase "sufficiently trained" and set forth no minimum **medical** or professional background or training requirement for the executioner – who is the only person responsible for actually administering the lethal injection drugs. *Id.*; contrast with *id.,* p.2. "Selection of the Execution Team," specifying medical and technical background requirements for other execution team members.

38.     Despite outlining no formal medical training requirements whatsoever, the executioner is tasked with extremely technical duties, including: "place the blunt cannula into the open port of the IV extension set connected to the primary line and push the entire contents of that syringe into the IV port *at a rate that meets the injection resistance of the cannula.*" *Id.*, p. 10. (12)(c)(1)-(3), (6)-(10) (emphasis supplied).

39.     Moreover, while the other team members must be selected from enumerated classes of trained professionals, some of which include "physician", no team member is, in fact, required to be a physician. *Id.,* p. 3 (3)(a)-(e).

40.     Without the required participation of an actual medical doctor at any time, the execution team is nonetheless supposed to be trained through quarterly simulations which "should anticipate various contingencies" such as "[u]nanticipated medical emergency concerning the inmate, an execution team member or executioner." *Id.,* p. 4. In addition, under the Lethal Injection Procedures,

the executioner responsible for administering the drugs is not in the same room as the condemned and administers the etomidate, rocuronium bromide, and potassium acetate remotely through many feet of IV tubing. *Id.,* p. 9 (10)(b) (condemned is in the execution chamber), (j) (execution team members to pass the saline "bags, along with the extension sets attached to lines labeled '1' and '2,' through a small opening into the executioner's room, where a team member will hang the bags on separate hooks inside the room."). This separation significantly lessens the probability that the executioner would even be aware of a blown vein when it occurs, making it very unlikely that the the executioner could recognize the extravasation and take appropriate action in a timely manner. *See also Id.*, p. 10 (11)(e)("[t]he execution chamber will be secured. Only the team warden, one (1) additional execution team member and one (1) FDLE monitor shall be allowed in the chamber during the administration of the execution.").

41.     The procedures do not specify which team member shall remain in the execution chamber; in other words, there is only one person present in the chamber with any possible medical background – but who is not required to be a medical doctor, and could be as minimally trained as an emergency medical technician with no higher level medical training. The Lethal Injection Procedures set forth that "[i]f at any time during the administration of the lethal chemicals the primary venous access becomes compromised, the team warden shall order the execution process

12

stopped" yet there is no requirement that the "team warden" have the requisite medical background or training to make such a determination. *Id*., p. 12 (12)(d); *see also id*. at p. 3 (definition of "team warden").

42.    The risk of extravasation or other complications is further heightened by the failure of the Lethal Injection Procedures to specify the required background for the execution team member responsible for "purchasing, maintaining and mixing the lethal chemicals", namely that they be either a licensed physician or a licensed pharmacist, *Id*., p. 3 (3)(e), also applies to the execution team member responsible for "prepar[ing] the lethal injection chemicals" on the day of execution. *Id.*, p. 6 (9)(f).  Preparation of the drugs by someone without medical or pharmaceutical training poses a substantial risk of a botched execution.

43.    The required certification of the Lethal Injection Procedures assures that "[t]he process will not involve unnecessary lingering or the unnecessary or wanton infliction of pain and suffering" yet the procedure set forth in *Id.*, p. 11, (12)(c)(5), in "the event the inmate is not unconscious" after the administration of the first three syringes, does necessarily prolong the time that Mr. Duckett would be experiencing excruciating pain.

C.  **Alternatives to Intravenous Access.**

44.    The Protocol specifies central venous cannulation as an alternative method of injection if intravenous access cannot otherwise be established. *Id*., p. 9

(10)(i).

45.     Central venous cannulation entails inserting a catheter into a central vein located either in the groin, or above or below the clavicle.

46.     Central venous cannulation requires adequately trained and experienced medical personnel to locate and catheterize a central vein.

47.     Central venous cannulation is a complicated medical procedure which should only be performed by properly trained and experienced medical personnel with access to the necessary tools and equipment. If done incorrectly or imprecisely, the technique risks puncturing arteries, creating a substantial risk of a torturous and botched execution.

48.     If central venous cannulation is not a viable alternative in a particular execution, upon information and belief, the Execution Team will attempt to perform a cutdown procedure "at one or more sites deemed appropriate" in order to have both primary and secondary lines. *Id*., p. 10 (10)(i).

49.     A cutdown procedure entails making a deep incision into the subject's skin to find a blood vessel, which is then cut open to allow for the insertion of a catheter.

50.     A cutdown procedure is an extremely painful, bloody, and complicated medical procedure that is rarely used by modern medical professionals.

51.    Because cutdowns are so painful and invasive, they are typically performed on a subject who is under deep sedation, not local anesthetic.

52.    Even on a sedated subject, a cutdown procedure requires greater skill than either intravenous access or central venous cannulation. Because it is so rarely used by modern medical professionals, most medical professionals have never been trained and do not possess the requisite skill to adequately perform a cutdown. Yet the Lethal Injection Procedures do not require that any execution team member be a medical doctor. *Id*., p. 4.

## CLAIMS FOR RELIEF

**Defendants' Lethal Injection Protocol as Applied to Mr. Duckett Violates His Eighth and Fourteenth Amendment Rights Under the United States Constitution.**

53.    The previous paragraphs of this complaint are incorporated by reference as fully stated herein.

54.    The Eighth Amendment's prohibition against cruel and unusual punishment forbids methods of execution that involve unnecessary or wanton infliction of pain and present a substantial risk of significant harm.

55.    Defendants' current Protocol calls for lethal injection, which requires the insertion of intravenous catheters to administer the lethal drug.

56.    Mr. Duckett's difficult-to-locate and irregular and thin veins create a substantial risk of unnecessary and excruciating pain during efforts to obtain IV

15

access and the administration of the lethal drug.

57. Because Mr. Duckett has severely compromised veins, it will be exceedingly difficult, if not impossible, for the IV Team to establish reliable, sustained intravenous access during the lethal injection procedure.

58. If the IV Team attempts to insert an intravenous catheter into Mr. Duckett's veins, they will very likely be unsuccessful and will, in the process, cause excruciating pain to Mr. Duckett by repeatedly attempting to insert needles into unidentifiable and/or inaccessible veins.

59. Even if the IV Team eventually does obtain intravenous access on Mr. Duckett to administer the lethal drug, Mr. Duckett's vein will likely lose structural integrity during the execution, leading to extravasation - the leakage of etomidate, rocuronium bromide, and potassium acetate into the soft tissue surrounding the vein.

60. Extravasation can have two severely painful results: (1) an inadequate and/or inconsistent drug delivery, which can cause a prolonged and only partially anesthetized execution; and (2) an intense burning of the tissues surrounding the vein.

61. Assuming the IV Team is even able to find and enter the necessary two veins, the risk of extravasation means that Mr. Duckett will then be at substantial risk to experience even more intense pain as a result of a prolonged and only partially anesthetized execution as his soft tissue burns within his body.

16

62.    Given the fact that the executioner will not be in the same room as Mr. Duckett, it is unlikely they will even be aware of the fact that extravasation has occurred.

63.    In addition, the risk of inconsistent and incomplete delivery of the drug to Mr. Duckett because it is being administered through many feet of IV tubing increases the risk of a prolonged and/or only partially anesthetized execution.

64.    Poor or reduced quality, potency, purity or stability of the compounded etomidate, rocuronium bromide, and potassium acetate also increases the risk that Mr. Duckett will suffer a prolonged and/or only partially anesthetized execution.

65.    Any factor that results in a prolonged and/or only partially anesthetized execution will cause Mr. Duckett to experience excruciating pain as the etomidate, rocuronium bromide, and potassium acetate suppresses his respiratory functioning and causes his organs to fail.

66.    Furthermore, should the attempts to provide intravenous access fail, the alternatives are central venous cannulation or a cutdown. Members of the execution team lack the professional skills, training, and/or necessary equipment to safely and humanely perform these procedures.

67.    Regardless of the cause, if the drugs are inconsistently or inadequately delivered, or if there is a problem with their quality, potency, purity or stability, Mr. Duckett may survive the admissions of the intended lethal dose. If Mr. Duckett

17

shows visible signs of life, according to the Protocol, the whole excruciating process will be repeated. *Id.*, p. 11, (12)(c)(5).

68. Alternatively, a problem with the quality, potency, purity or stability of the drug, or failed or inadequate drug delivery due to compromised veins could result in brain damage to Mr. Duckett, rather than death.

69. Even if the Defendants' lethal injection drug, etomidate, rocuronium bromide, and potassium acetate, could be humanely and effectively administered to Mr. Duckett, the risk of inadequate or inconsistent drug delivery resulting from the many feet of IV tubing and problems with the quality, potency, purity or stability of the drug significantly exacerbate this problem.

70. As a result, Mr. Duckett is at a substantial risk of remaining conscious while the etomidate, rocuronium bromide, and potassium acetate suppress his respiratory system and causes his organs to fail.

71. Central venous cannulation or a cutdown procedure while Mr. Duckett is conscious would further subject Mr. Duckett to excruciating pain.

72. The etomidate, rocuronium bromide, and potassium acetate injections may also induce pulmonary edema, as is common in Florida executions. If this occurs, and Mr. Duckett is not fully insensate, he will feel his lungs filling with fluid, drowning internally, also resulting in the excruciating sensation of suffocating to death.

73.    Individually or in combination, Mr. Duckett's medical conditions; the unknown and untested quality, potency, purity and stability of the potentially compounded etomidate, rocuronium bromide, and potassium acetate; the execution team's inadequate skill, experience, and training; the risk of drug mixing between the two men scheduled to be executed due to the dual execution; and other problematic elements of the Protocol as applied to Mr. Duckett (i.e., long tubing, remote injection, alternatives to intravenous access) are sure or very likely to cause Mr. Duckett needless pain and suffering, and put him in imminent danger.

74.    There is a substantial and objectively intolerable risk that Mr. Duckett will experience severe pain and suffering if DOC and the Prison proceed to execute him by lethal injection under the Protocols, in violation of his Eighth Amendment rights.

75.    These risks to Mr. Duckett are so substantial and imminent that, if he is executed by lethal injection under the Protocols, the Defendants cannot claim they are subjectively blameless for the purposes of the Eighth Amendment.

76.    Cases similar to Mr. Duckett's have shown us that this risk is real. In February of 2018, defendant Doyle Hamm brought an action pursuant to 42 U.S.C. § 1983 alleging that lethal injection as applied to him would constitute cruel and unusual punishment due to his compromised veins and health issues. *See Hamm v. Comm'r, Ala. Dept. of Corr.*, 725 Fed. App. 836 (11th Cir. Feb. 22, 2018). The

19

district court found that Mr. Hamm could not show a significant likelihood of merits on the claim, which was affirmed by the Eleventh Circuit Court of Appeals. *Id.* at 844. On the day the opinion was released, the State of Alabama attempted, but was unsuccessful, in executing Mr. Hamm. Subsequent investigation discovered that the execution team had attempted to place IV lines in Mr. Hamm for over two hours before calling off the execution, and, as a result of the botched procedure, Mr. Hamm suffered multiple bruises and contusions.[2] Mr. Hamm was the third person to survive a botched lethal-injection attempt. *Id.*

77.    There is an alternative method of execution that is feasible and readily implemented which will significantly reduce or eliminate the substantial risk of severe pain to Mr. Duckett. That alternative method is execution by a firing squad.

78.    Execution by use of a firing squad is a known and available alternative method. The Supreme Court has held that the firing squad is a constitutionally permissible form of execution.

79.    Florida law permits execution by any method not deemed unconstitutional in accordance with § 922.105, Fla. Stat. § 922.10, Fla. Stat. (2025); § 922.105, Fla. Stat. (3)(2025).

---

[2] *See Alabama Death-Row Prisoner Doyle Hamm, Who Survived Botched Execution Attempt, Dies of Cancer*, https://deathpenaltyinfo.org/alabama-death-row-prisoner-doyle-hamm-who-survived-botched-execution-attempt-dies-of-cancer.

80.    The firing squad is not deemed unconstitutional in Florida law.

81.    A plaintiff is not limited to choosing a method that is already in use in the state. As the Supreme Court has recognized "[a]ny method not deemed unconstitutional" includes methods that will necessitate a change in law. *Nance v. Ward*, 597 U.S. 159, 170 (2022). The defendant meets their burden if they can point to viable well-established options from other states. *Id.* at 164.

82.    Since 1976, Utah has carried out three executions by firing squad - most recently on July 18, 2010.[3]

83.    South Carolina has also carried out three executions by firing squad – most recently on November 14, 2025.[4]

84.    Protocols for execution by firing squad are known and available. Utah's technical manual, specifying the state's execution protocol in great detail, is publicly accessible. *See* Technical Manual of Utah Department of Corrections; *see also Utah Brings Back the Firing Squad, So How Does It Work?*, ASSOCIATED PRESS, Mar. 24, 2015.

85.    Utah's "well-established protocol [] is a potentially viable option" for adoption by Florida. *See Price v. Comm'r, Ala. Dep't of Corr*, 920 F.3d 1317, 1326

---

[3] Kirk Johnson, *Double Murderer Executed by Firing Squad in Utah*, N.Y. TIMES, June 19, 2010, at A12.

[4] Sam Levin, *South Carolina executes man by firing squad, in state's third such killing in a year,* The Guardian, November 14, 2025.

(11th Cir. 2019)(petitioner can meet his burden to show a feasible, readily implementable alternative by identifying a well-established protocol in another state).

86. Florida could easily identify qualified personnel to carry out an execution by firing squad. Furthermore, upon information or belief, Florida already has a sufficient stockpile or can readily obtain both the weapons and ammunition necessary to carry out an execution.

87. Moreover, execution by firing squad is both swift and virtually painless. If performed properly, the use of a firing squad will eliminate the substantial risk of severe pain that Defendants' current execution Protocol presents to Mr. Duckett. *See, e.g., Lee v. Comm'r, Ala. Dept. of Corr.*, No. 26-12027, 2026 WL 175182, at *4 (11th Cir. June 10, 2026) (execution by firing squad significantly reduces the risk of severe harm posed by the state's method). Evidence and recent experience strongly suggest that the firing squad is significantly more reliable than lethal injection.

88. Accordingly, an execution by firing squad is a known and available alternative method of execution that presents a substantially lower risk of pain and suffering to Mr. Duckett than Defendants' Protocols for lethal injection.

89. Faced with this viable alternative, if the Defendants refuse to adopt Mr. Duckett's proposed alternative, without a legitimate penological justification for

adhering to its current method of execution, then it should be viewed as a choice by the Defendants to intensify the sentence of death with a cruel "superaddition" of terror and pain, in violation of the Eighth Amendment of the United States Constitution.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

90.     Plaintiff does not believe that exhaustion is necessary under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. 1997e, because this lawsuit does not challenge prison conditions and because there are no administrative remedies available that could provide redress for the challenged violations of his constitutional rights. In the past, moreover, Defendants have rejected grievances concerning the state's method of execution from.

91.     Plaintiff has nevertheless attempted to exhaust remedies by filing an informal grievance on July 23, 2026.

**PRAYER FOR RELIEF**

For the foregoing reasons, Plaintiff James Duckett respectfully requests that this Court:

1.     Enter a declaratory judgment under 42 U.S.C. § 1983 that Defendants' plans to execute Mr. Duckett by lethal injection violate Mr. Duckett's rights under the Eighth and Fourteenth Amendments of the United States Constitution;

23

2.    Grant injunctive relief to enjoin the Defendants from proceeding with the execution of Mr. Duckett by lethal injection under 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments of the United States Constitution; and,

3.    Issue any further relief as it seems just and proper.

Dated: July 23, 2026

Respectfully submitted,

/s/ *Mary E. Wells*
MARY E. WELLS
Fla. Bar. No. 0866067
Law Office of M.E. Wells LLC
623 Grant Street SE
Atlanta, GA 30312
*mewells27@comcast.net*
Tel. (404) 408-2180

/s/ *Brittney N. Lacy*
BRITTNEY N. LACY
Assistant CCRC-South
Fla. Bar. No. 116001
*lacyb@ccsr.state.fl.us*

/s/ *Courtney M. Hammer*
COURTNEY M. HAMMER
Assistant CCRC-South
Fla. Bar. No. 1011328
*hammerc@ccsr.state.fl.us*
*ccrcpleadings@ccsr.state.fl.us*

Capital Collateral Regional
Counsel - South
110 SE 6th Street, Suite 701

24

25

Fort Lauderdale, Florida 33301
Tel. (954) 713-1284